FILED
2021 Mar-29  AM 11:44
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| MARSHA JEAN BUNN, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Case No.   2:20-cv-00218-HNJ |
| | ) | |
| SOCIAL SECURITYADMINISTRATION, | ) | |
| COMMISSIONER, | ) | |
| | ) | |
| Defendant | ) | |

## MEMORANDUM OPINION

Plaintiff Marsha Jean Bunn seeks judicial review pursuant to 42 U.S.C. § 405(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner"), regarding her claim for a period of disability and disability insurance benefits. The undersigned carefully considered the record, and for the reasons expressed herein, **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder. The Regulations define "disabled" as the "inability to do any substantial gainful activity by reason of any

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate Judge conduct any and all proceedings, including the entry of final judgment.

medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve (12) months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon the claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five, if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that it "significantly limits [the] physical or mental ability to do basic work activities . . . ." *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part

2

404, Subpart P, App. 1, §§ 1.00-114.02. *Id.* at § 404.1520(d). If a claimant's impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue*, 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience.") (citing 20 C.F.R. § 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 404.1520(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 404.1520(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant work, the evaluator will determine the claimant is not disabled. *See id.*

3

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education and past work experience, that the claimant is capable of performing other work.   20 C.F.R. § 404.1520(g).   If the claimant can perform other work, the evaluator will not find the claimant disabled.   *See id.* § 404.1520(a)(4)(v); *see also* 20 C.F.R. § 404.1520(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court reviews the ALJ's "decision with deference to the factual findings and close scrutiny of the legal conclusions."   *Parks ex rel. D.P. v. Comm'r, Soc. Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)).   The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards.   *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Although the court must "scrutinize the record as a whole . . . to determine if the decision reached is reasonable . . . and supported by substantial evidence," *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ.   *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a

4

reasonable person would accept as adequate to support a conclusion." *Id.* (citations omitted). Nonetheless, substantial evidence exists even if the evidence preponderates against the Commissioner's decision. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Although the court reviews the ALJ's decision for substantial evidence, the court reviews her application of legal principles de novo. *Id.*

## FACTUAL AND PROCEDURAL HISTORY

Ms. Bunn, age 43 at the time of the ALJ hearing, protectively filed an application for a period of disability and disability insurance benefits on July 12, 2017, alleging disability beginning August 24, 2016. (Tr. 36-37, 148-49). The Commissioner denied Bunn's claims, and Bunn timely filed a request for a hearing on October 26, 2017. (Tr. 59-60, 86-87). An Administrative Law Judge ("ALJ") held a hearing on March 14, 2019 (Tr. 34-54), and issued an opinion denying Bunn's claim on April 17, 2019. (Tr. 14-29).

Applying the five-step sequential process, the ALJ found at step one that Bunn had not engaged in substantial gainful activity since August 24, 2016. (Tr. 19). At step two, the ALJ found Bunn had the severe impairments of cervical fusion of C4-C5 and C5-C6, obesity, depression, and anxiety. (*Id.*). At step three, the ALJ found Bunn's impairments, or combination of impairments, did not meet or medically equal any impairment for presumptive disability listed in 20 C.F.R. Part 404, Subpart P, Appendix

5

1.  (Tr. 21).   Next, the ALJ found that, despite her impairments, Bunn exhibited the

residual functional capacity ("RFC") to perform

> light work as defined in 20 CFR 404.1567(b) except she should not climb
> ladders, ropes, or scaffolds, and she should not push or pull foot controls
> with her right lower extremity.   She should not kneel, crouch, or crawl,
> and she have [sic] no excessive vibration, unprotected heights, or
> hazardous machinery.   Contact with the general public should not be an
> essential part of her job duties, and she can have work that can be around
> co-workers throughout the day but with only occasional interactions with
> co-workers.   She has the ability to attend and concentrate for two-hour
> periods with no more than occasional workplace changes.   She can only
> perform unskilled work with the ability to make simple work related
> decisions.   She should also have a sit/stand option up to one hour at a
> time – sitting up to one hour before standing up to one hour.

(Tr. 23-24).   At step four, the ALJ determined that Bunn could not perform her past

relevant work as a retail clerk and school lunch room attendant.   (Tr. 27).   However,

at step five, the ALJ determined that, considering Bunn's age, education, work

experience, and RFC, she could perform a significant number of other jobs in the

national economy, such as price marker, ticket taker, and silverware wrapper.   (Tr. 27-

28).   Accordingly, the ALJ found that Bunn did not suffer a disability, as defined by

the Social Security Act, since August 24, 2016.   (Tr. 28).

Bunn timely requested review of the ALJ's decision.   (Tr. 142-44).   On January

7, 2020, the Appeals Council denied review, which deems the ALJ's decision as the

Commissioner's final decision.   (Tr. 1-8).   On February 18, 2020, Bunn filed her complaint with the court seeking review of the ALJ's decision.   (Doc. 1).

**ANALYSIS**

In this appeal, Bunn argues the ALJ:   (1) failed to consider her back condition as a severe impairment; (2) improperly determined she failed to meet the requirements of Listings 12.04 and 12.06; (3) improperly evaluated the medical evidence; (4) erroneously found she retained the residual functional capacity to complete a limited range of light work; and (5) improperly discredited her subjective complaints of pain, mental and psychological symptoms, and other non-exertional limitations.   For the reasons discussed below, the undersigned concludes none of Bunn's contentions warrant reversal.

## I.     The ALJ Did Not Err By Failing To Consider Bunn's Back Condition As A Severe Impairment

As discussed, at step two of the sequential evaluation process, the ALJ found Bunn had the severe impairments of cervical fusion of C4-C5 and C5-C6, obesity, depression, and anxiety.   (Tr. 19).   Bunn argues the ALJ should also have considered her back condition as a severe impairment.

Step two of the sequential evaluation process, during which the ALJ considers the medical severity of a claimant's impairments, constitutes a "'threshold inquiry' and

'allows only claims based on the most trivial impairments to be rejected.'" *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1264-65 (11th Cir. 2019) (citing *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n. 8 (11th Cir. 2004); *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986)).

An impairment or combination of impairments manifests as "non-severe" if it "does not significantly limit [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1522(a).  The term "basic work activities" refers to "the abilities and aptitudes necessary to do most jobs," including:

    (1)    Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

    (2)    Capacities for seeing, hearing, and speaking;

    (3)    Understanding, carrying out, and remembering simple instructions;

    (4)    Use of judgment;

    (5)    Responding appropriately to supervision, co-workers and usual work situations; and

    (6)    Dealing with changes in a routine work setting.

20 C.F.R. § 404.1522(b).  Thus, an ALJ should characterize an impairment as non-severe "only if the abnormality is so slight and its effect so minimal that it would clearly not be expected to interfere with the individual's ability to work, irrespective of age,

education or work experience."   *Schink,* 935 F.3d at 1265 (citing *McDaniel*, 800 F.2d at 1031).

Here, the ALJ's opinion manifests internal inconsistencies regarding the consideration of Bunn's back condition as a severe impairment.   The sub-heading for the ALJ's step two analysis states:   "The claimant has the following severe impairments: cervical fusion of C4-C5 and C5-6, obesity, depression, and anxiety (20 CFR 404.1520(c))."   (Tr. 19).   The ALJ then proceeded to explain why those conditions constituted severe impairments, but her explanation also referenced Bunn's back condition:

> The above medically determinable impairments significantly limit the ability to perform basic work activities as required by SSR 85-28.
>
> The claimant has a history of back and leg pain with weakness and giving way of the legs causing falling.   Objective testing including MRI and myelogram of the lumbar spine, bone scan, and MRI of the pelvis were normal . . . .   An EMG and nerve conduction study was consistent with only "mild[]" right L5-S1 radiculopathy with no evidence of neuropathy . . . .   In October 2016, the treating orthopedic doctor, Dr. Craig, noted "a large gap between the subjective and objective presentation . . . ."   However, she was subsequently diagnosed with cervical stenosis with myelopathy.   In June 2017, she underwent a cervical discectomy and fusion at C4-5 and C5-6. . . .   By July 27, 2017, an examination was normal except for obesity; the claimant is 67 inches tall and weighed 263 pounds for a body mass index of 41.19.   The claimant had no edema, no motor deficits, normal strength and appropriate mood and affect . . . .   There is no indication in the record of additional treatment for a physical complaint.   Thus, there is no indication in the

9

record of a disabling physical impairment that persisted for 12 continuous months following her alleged onset date.

The claimant underwent a physical consultative examination (CE) in September 2017 performed by Jorge Blanco, M.D. . . . The claimant had complaint of low back pain with radiation of the pain into the right lower extremity. The examination was normal except for obesity and tenderness over the spine. She had full range of motion of the spine and all joints, normal gait, negative straight leg raises, no motor or sensory deficits, and normal affect. Thus, the CE supports the finding that the [cervical fusion] surgery provided marked improvement in her symptoms.

The claimant was also noted in treating medical records to be diagnosed as having depression and an anxiety disorder . . . . Although the claimant was noted to have some symptoms related to her depression and anxiety at times, the treating medical records have also noted the claimant to have fairly normal psychiatric examinations, and the claimant has denied having anxiety and depression during some treating office visits . . . .

(Tr. 20). The ALJ then referenced "other impairments" depicted in Bunn's medical records, including headaches and a history of substance abuse, but she determined those impairments did not qualify as severe. She did not describe Bunn's back condition as one of those non-severe, "other impairments." (Tr. 20).

The court cannot discern why the ALJ failed to list Bunn's back condition as a severe impairment, but then proceeded to discuss the back condition in conjunction with the impairments she did consider severe, rather than the impairments she considered non-severe. Moreover, the evidence warrants a finding that Bunn's back problems caused more than a slight abnormality and significantly affected Bunn's ability

10

to work, thereby qualifying them as "severe" impairments.   *See Schink,* 935 F.3d at 1265 (citing *McDaniel*, 800 F.2d at 1031).   Bunn reported her back pain began soon after she underwent gallbladder removal surgery on September 17, 2015.   (Tr. 339, 379, 387, 389, 413).   Even though Bunn's diagnostic testing reflected normal findings (Tr. 346, 371), the medical records also reflect complaints of level 6-10 back pain, pain with range of motion, leg weakness, and numbness between September 2016 and May 2017.   (Tr. 267-79, 282, 304, 307-18, 365-68, 372-75, 381-84, 394, 401, 409).   The back pain warranted prescription medication and epidural injections, neither of which provided adequate relief.   (Tr. 266, 363, 397-98, 400).   Bunn received diagnoses of chronic low back pain, thoracic radiculopathy, and lumbosacral radiculopathy from various medical providers.   (Tr. 302, 308, 347-57, 397, 403, 407, 411, 414).

During the administrative hearing, Bunn characterized her back pain as her most severe impairment, and she testified the pain caused weakness in her leg that had resulted in falls; furthermore, it prevented her from sitting more than 30 to 45 minutes, standing more than 15 to 20 minutes, and performing some household and personal care tasks.   (Tr. 40, 43-44, 48-49).   *See Schink,* 935 F.3d at 1265-68 (claimant's mental impairments presented more than a slight abnormality when "he was referred to and saw various mental-health professionals over a period of years," those professionals

11

consistently diagnosed mental health disorders, and the claimant reported symptomatology consistent with the providers' assessments).

Even so, the ALJ's failure to include Bunn's back problems among her severe impairments does not warrant reversal.  The Eleventh Circuit has held that an ALJ's failure to find a severe impairment at stage two "could be harmless if the ALJ nevertheless proceeded in the sequential evaluation, duly considered [the claimant's] mental impairment when assessing his RFC, and reached conclusions about [the claimant's] mental capabilities supported by substantial evidence."  *Schink*, 935 F.3d at 1268.  The erroneous finding of non-severity constitutes reversible error only when the ALJ limits her RFC assessment to the effects of the impairments she characterized as "severe," and omits discussion of the non-severe impairments.  As the Eleventh Circuit has stated,

> consideration of all impairments, severe and non-severe, is required when assessing a claimant's RFC. *Bowen v. Heckler*, 748 F.2d 629, 634-35 (11th Cir. 1984). The ALJ must also consider a claimant's medical condition taken as a whole. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014); *Phillips*, 357 F.3d at 1237 (ALJ has a duty to consider impairments in combination and to determine whether combined impairments render the claimant disabled); *see also* 20 C.F.R. § 404.1523(c) and Social Security Ruling 96-8p.  If an ALJ fails to address the degree of impairment caused by the combination of physical and mental medical problems, the decision that the claimant is not disabled cannot be upheld. *Bowen*, 748 F.2d at 634 ("[I]t is certain that mental and psychological defects can combine with physical impairments to create total disability to perform gainful employment." (quoting *Brenem v.*

12

*Harris,* 621 F.2d 688, 690 (5th Cir. 1980))).

*Schink*, 935 F.3d at 1268-69 (alteration in original).

Here, the ALJ stated that she "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Tr. 24).  While that recitation alone does not suffice under Eleventh Circuit standards, the ALJ's decision as a whole reflects the ALJ considered all of Bunn's symptoms, including her back impairment, in determining her residual functional capacity.  *See Schink,* 935 F.3d at 1269 ("Here, although the ALJ stated he 'considered all symptoms' when assessing Schink's RFC, the content of his decision demonstrates he did not.").

The ALJ acknowledged Bunn's allegation that back pain limited her ability to perform work activity.  (Tr. 24).  Her RFC finding also includes limitations one could attribute to back pain and resulting leg weakness, such as no climbing ladders, ropes, or scaffolds; no pushing or pulling foot controls with the right lower extremity; no kneeling, crouching, or crawling; and a sit-stand option.  (Tr. 23-24).  Those limitations indicate the ALJ accounted for Bunn's back condition in assessing her functional limitations.

The ALJ also discussed medical evidence addressing Bunn's back problems, including objective testing of her lumbar spine functioning (Tr. 20, 280, 346, 371, 379);

13

Dr. Aye Unnoppet's July 2017 physical examination, which produced normal results except for obesity (Tr. 20, 25, 307); Dr. Jorge Blanco's September 2017 consultative examination report, which acknowledged Bunn's complaints of low back pain but produced normal results except for obesity and spinal tenderness (Tr. 20, 26, 455-60); and Dr. James Bailey's September 2017 state agency opinion, which noted Bunn's longitudinal treatment for back pain but nonetheless assessed an ability to perform light work.   (Tr. 26, 73-74).

Based on the foregoing, the ALJ adequately considered Bunn's back condition despite failing to list it as a severe impairment.   Accordingly, the ALJ did not err at step two of the sequential evaluation process.

## II.   The ALJ Properly Considered Bunn's Mental Impairments Under Listings 12.04 and 12.06

To meet the requirements of a Listing, Bunn must "have a medically determinable impairment(s) that satisfies all of the criteria in the listing." 20 C.F.R. § 404.1525(d).   The Listings of Impairments in the Social Security Regulations identify impairments so severe as to prevent a person from engaging in gainful activity. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.   If the claimant claims an impairment that equals a listed impairment, the claimant must present evidence that describes how the impairment possesses such an equivalency. *Armstrong v. Comm'r of Soc. Sec.*, 546 F. App'x

14

891, 894 (11th Cir. 2013) (citing *Wilkinson ex rel. Wilkinson v. Bowen*, 847 F. 2d 660, 662 (11th Cir. 1987)).   If Bunn meets a listed impairment or otherwise establishes an equivalence, the regulations conclusively presume a disability. *See* 20 C.F.R. § 416.920(d).   If an impairment manifests only some of the criteria, then it does not qualify, no matter how severe the impairment. *Nichols v. Comm'r of Soc. Sec.*, 679 F. App'x 792, 795 (11th Cir. 2017) (citing *Sullivan v. Zogby*, 493 U.S. 521, 530 (1990)).

At step three, the ALJ concluded that Bunn's depression and anxiety disorder do not meet the criteria for Listing 12.04. (Tr. 22).   However, Listing 12.04 addresses only affective disorders, and Bunn argues she satisfies the criteria for Listing 12.06 as well, which addresses anxiety disorders.   20 C.F.R. § Pt. 404, Subpt. P, App'x 1, §§ 12.04, 12.06.   However, the ALJ's failure to discuss Listing 12.06 represents harmless error, as both listings contain the same criteria in "paragraph B," and the ALJ found that Bunn did not satisfy the "paragraph B" criteria.[2]

---

[2] Bunn also asserts that she satisfies the "paragraph A" of both listings.  The ALJ did not address paragraph A of either listing, but she did not need to do so, as Listings 12.04 and 12.06 require the satisfaction of *both* the "A" criteria *and* the "B" criteria.   Because the ALJ found Bunn did not satisfy the "B" criteria, she did not need to evaluate the "A" criteria.   Listings 12.04 and 12.06 also present an alternative method of proof in "paragraph C," but Bunn has not alleged satisfaction of the "C" criteria for either listing.

Paragraph B of Listings 12.04 and 12.06 states that the mental impairment must result in extreme limitations in at least one of the following categories, or marked limitations in at least two of the following categories: (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; or (4) adapting or managing oneself. 20 C.F.R. § Pt. 404, Subpt. P, App'x 1, §§ 12.04, 12.06. [3]   The ALJ found Bunn experienced no limitation in understanding, remembering, or applying information; moderate limitation in interacting with others; moderate limitation in concentrating, persisting, and maintaining pace; and no limitation in adapting and managing herself.

Bunn argues the ALJ erred because Dr. Paul G. LaRussa, her psychiatrist, opined she experienced marked limitation in her ability to sequence multi-step activities, which falls under the category of understanding, remembering, and applying information; marked limitation in the abilities to sustain an ordinary routine and regular attendance at work, and to work a full day without needing more than the allotted number or length of rest periods, which fall under the category of maintaining concentration, persistence, or pace; marked limitation in the ability to respond to requests, suggestions, criticism,

---

[3] A "marked" limitation means the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is seriously limited."  20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 12.00(F)(2)(d).  An "extreme" limitation means the claimant is "not able to function in this area independently, appropriately, effectively, and on a sustained basis." *Id.* § 12.00(F)(2)(e).

correction, and changes, which falls under the category of interacting with others; and extreme limitation in the abilities to handle conflicts and keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness, which also fall under the category of interacting with others. (Tr. 451-53).

However, as discussed more fully below, the ALJ properly found Dr. LaRussa's opinion unpersuasive because it was "inconsistent with the record that shows improved mental status functioning after treatment for substance abuse." (Tr. 26). No other record evidence supports a finding of marked or extreme limitations in any of the relevant functional categories. As the ALJ observed, Bunn self-reported her abilities to prepare meals, pay bills, take medications, shop, and drive, and treatment providers noted she possessed logical thought processes, appropriate thought content, fair insight, no perceptual impairments, adequate fund of knowledge, and intact memory, thereby supporting the ALJ's conclusion that Bunn experienced no limitation in understanding, remembering, and applying information. (Tr. 22).

The ALJ also reasoned that Bunn's reports of ceasing social activities supported a finding of moderate limitation of the ability to interact with others, but she did not assess any greater limitations in that functional area because Bunn reported being able to deal appropriately with authority, and medical providers described her as cooperative and comfortable during appointments. (Tr. 23). Finally, the ALJ assessed only

17

moderate limitation in concentrating, persisting, and maintaining pace: although Bunn reported her back pain limited her ability to maintain a regular work schedule, she could drive, prepare meals, and handle her own finances, and medical sources noted she possessed good insight, judgment, social skills, attention, and concentration.   (*Id.*). Substantial evidence supported those conclusions; consequently, the ALJ did not err by finding Bunn failed to satisfy the requirements of Listings 12.04 and 12.06.

## III.   The ALJ Properly Considered The Medical Evidence

Next, Bunn contends the ALJ improperly considered the opinions of non-examining physicians over the opinions of her treating primary care physician and treating psychiatrist.   The Social Security Administration revised its regulations regarding the consideration of medical evidence for all claims filed after March 27, 2017. *See* 82 FR 5844-01, 2017 WL 168819 (Jan. 18, 2017).   Because Bunn filed her claim for benefits after March 27, 2017, 20 C.F.R. § 404.1520c, the revised regulation, governs.

Under that provision, an ALJ must apply the same factors in considering all medical opinions and administrative medical findings, rather than affording specific evidentiary weight to any particular provider's opinion.   20 C.F.R. § 404.1520c(a). Supportability and consistency constitute the most important factors in any evaluation, and the ALJ must explain the consideration of those factors.   20 C.F.R. § 404.1520c(b)(2).   Thus, "[t]he more relevant the objective medical evidence and

supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s)," and "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources the more persuasive the medical opinions or prior administrative medical finding(s) will be."   20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ also may consider the medical source's specialty and the relationship between the claimant and the medical source, including the length, purpose, and extent of the treatment relationship, and the frequency of examinations.   20 C.F.R. § 404.1520c(c)(3)(i)-(iv).   The ALJ "may" conclude that an examining medical source will understand the claimant's impairments better than a medical source who only reviews evidence in the claimant's file.   20 C.F.R. § 404.1520c(c)(3)(v).   The ALJ also "will consider other factors that tend to support or contradict a medical opinion or prior administrative medical finding," including, but not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements."   20 C.F.R. § 404.1520c(c)(5).

A.     Dr. Unnoppet's Opinion

Dr. Unnoppet, Bunn's primary care physician, completed a Physical Assessment form on July 27, 2017. He stated Bunn's symptoms would constantly interfere with the attention and concentration required to perform simple work-related tasks. Her medications would cause side effects, like dizziness, drowsiness, somnolence, and mood swings, that would affect her ability to work. Dr. Unnoppet opined that, during an eight-hour workday, Bunn would need to recline or lie down more than customary breaks would allow. Bunn could not walk a full city block. She could sit for a total of one hour, and stand and walk for a combined total of 30 minutes, in an eight-hour workday. She would require an unscheduled 20-minute break every 15 to 30 minutes. She could occasionally lift up to ten pounds, but she could never lift more than ten pounds. She could use her hands to grasp, turn, and twist objects 80% of the workday; she could use her fingers for fine manipulation 10% of the workday; and she could use her arms to reach 10% of the workday. She would likely miss work more than four times a month as a result of her symptoms, which Dr. Unnoppet opined reasonably resulted from Bunn's thoracic radiculopathy. (Tr. 448-49).

The ALJ found Dr. Unnoppet's opinion unpersuasive in light of "the medical evidence in the record, the claimant's reports of daily activities, and other evidence in the record." (Tr. 25). Specifically, the ALJ discerned Dr. Unnoppet's treatment notes from the same date as his assessment reflected a normal examination except for obesity,

20

and Bunn did not receive any additional treatment for a physical complaint.   The record supports that conclusion, and pursuant to the revised regulations, the ALJ appropriately determined that Dr. Unnoppet's treatment notes failed to support his opinions about Bunn's functional limitations.   (Tr. 307-08).

The ALJ also observed that Dr. Blanco's consultative examination produced normal results except for obesity and reports of tenderness.   (Tr. 25).   During the consultative examination with Dr. Blanco, Bunn reported severe lower back pain radiating into her right leg.   She claimed she could stand for only 15 minutes at a time before needing to sit down to relieve the pain, but if she sits for too long, she needs to stand to relieve tension.   Bunn also reported depression and anxiety as a result of her pain and inability to work.

Dr. Blanco's physical examination revealed normal results except for obesity and palpable tenderness over the thoracic and lumbar spine.   Specifically, Dr. Blanco detected normal gait without an assistive device, normal responses to questions, no apparent distress, full range of motion in extremities, no swelling or tenderness in joints, negative straight-leg raise test, normal reflexes, normal strength, normal affect, and full orientation as to time, place, and situation.   Bunn also displayed normal dexterity and grip strength.   Dr. Blanco opined that Bunn could perform work-related activities such

as sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, and traveling.   (Tr. 455-60).

The ALJ also credited the September 18, 2017, opinion of state agency physician, James Bailey, as it was "consistent with the record as a whole" and "supported b[y] the objective findings in the record."   (Tr. 26).   Dr. Bailey opined Bunn could occasionally lift and/or carry 20 pounds, frequently lift and/or carry ten pounds, stand and/or walk six hours in a workday, sit six hours in a workday, and perform otherwise unlimited pushing and/or pulling movements with her hands and feet.   She could never climb ladders, ropes, or scaffolds, but she could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl.   She experienced no manipulative, visual, or communicative limitations.   She could tolerate unlimited noise, but she would need to avoid concentrated exposure to extreme heat and cold, wetness, humidity, vibration, fumes, odors, dusts, gasses, and poor ventilation.   She would need to avoid all exposure to hazards such as machinery and heights.   Dr. Bailey concluded those functional limitations supported an RFC of light work.   (Tr. 72-74).

Dr. Blanco's consultative opinion and Dr. Bailey's administrative assessment support the ALJ's decision to find Dr. Unnoppet's opinion unpersuasive, and the ALJ appropriately considered the consistency of those other medical opinions with Dr. Unnoppet's under the guidance of the revised regulation.   As the revised regulation

22

permits, the ALJ relied more upon the support for Dr. Unnoppet's opinions in the medical records and the consistency of the opinion with the other medical evidence, not the treating relationship between Bunn and Dr. Unnoppet.   Moreover, as discussed, substantial record evidence supports the ALJ's decision.   Accordingly, the ALJ did not err in evaluating Dr. Unnoppet's opinion.

### B.    Dr. LaRussa's Opinion

Dr. LaRussa, Bunn's treating psychiatrist, completed a Mental Capacity Assessment on August 4, 2017.   In the functional area of understanding, remembering, or applying information, he found that Bunn experienced mild limitation of the ability to follow one- or two-step oral instructions; moderate limitation of the abilities to recognize a mistake and correct it, identify and solve problems, and use reason and judgment to make work-related decisions; and marked limitation of the ability to sequence multi-step activities.

In the functional area of concentration, persistence, and pace, Bunn experienced mild limitation of the ability to initiate and perform tasks she knows how to do; moderate limitation of the abilities to work at an appropriate and consistent pace, complete tasks in a timely manner, ignore or avoid distractions while working, and work close to or with others without interrupting or distracting them; and marked limitation

of the abilities to sustain an ordinary routine and regular attendance at work and work a full day without needing more than the allotted number or length of rest periods.

In the functional area of adapting or managing oneself, Bunn experienced mild limitation of the abilities to maintain personal hygiene and attire appropriate to a work setting, be aware of normal hazards, and take appropriate precautions; and moderate limitation of the abilities to adapt to changes, manage psychologically based symptoms, distinguish between acceptable and unacceptable work performance, set realistic goals, and make plans independently of others.

In the functional area of interacting with others, Bunn experienced mild limitation of the ability to understand and respond to social cues; moderate impairment of the abilities to cooperate with others and ask for help when needed; marked impairment of the ability to respond to requests, suggestions, criticism, correction, and challenges; and extreme limitation of the abilities to handle conflicts with others and keep social interactions free of excessive irritability, sensitivity, argumentativeness, or suspiciousness.

The medical findings supporting Dr. LaRussa's assessment included depression associated with suicidal thoughts requiring hospital admission.   Dr. LaRussa stated that substance abuse had a moderate impact on his assessment, and he noted Bunn struggles

24

with substance abuse.  Dr. LaRussa indicated Bunn possessed the ability to manage financial benefits in her own best interest.   (Tr. 451-53).

The ALJ concluded Dr. LaRussa's opinion was "not persuasive because it is inconsistent with the record that shows improved mental status functioning after treatment for substance abuse." (Tr. 26).  Again, the ALJ relied appropriately upon the consistency of the doctor's opinion with other medical evidence, and the record supported the ALJ's conclusion.

Bunn underwent outpatient treatment at Bradford Health Services between August 15, 2017, and October 5, 2017.   (Tr. 464-73).   Upon discharge, she demonstrated positive mood, normal speech, good insight and judgment, full orientation, and no suicidal or homicidal ideations.  (Tr. 472).   During an October 12, 2017, follow-up visit with Dr. LaRussa, Bunn reported she was "doing great," and she stated, "This is the best I have felt in a long time."  (Tr. 475).  She experienced no cravings or use of illicit substances.   During the examination, she displayed euthymic mood and affect, fluent speech, logical and goal-directed thought process, appropriate and logical thought content, no delusional thinking, no perceptual impairment, full orientation, intact memory, intact attention and concentration, good fund of knowledge and language function, good insight and judgment, and no homicidal or suicidal thoughts.  On November 17, 2017, she reported continuing to feel great, with bright

25

affect, no suicidal ideation, and no medication side effects.   The examination produced findings similar to the previous visit.   (Tr. 478-81).

In contrast, the ALJ found the August 29, 2017, assessment of Dr. Estock, the state agency psychiatrist, to be "somewhat persuasive," even though the ALJ noted Bunn's mental status had improved even more since Dr. Estock's evaluation. Bunn reported feeling great and demonstrated improved mental status functioning during psychiatric visits, as discussed in the previous paragraph.   (Tr. 26).   Dr. Estock opined that an employer could expect Bunn to understand, remember, and carry out short, simple instructions and tasks, but Bunn would likely experience difficulty with more detailed tasks and instructions.   An employer could expect Bunn to maintain attention and concentration for two hours with all customary rest breaks, but Bunn would need a well-spaced work environment to maximize her concentration, and she likely would miss work one to two days a month due to psychological symptoms.   Bunn would need infrequent and non-intensive contact with the public and tactful, constructive, non-threatening supervision.   She could tolerate infrequent and gradually introduced changes in the workplace.   (Tr. 74-76).

Pursuant to the revised regulation, the ALJ properly considered the consistency of Dr. Estock's assessment with the other medical evidence, and substantial evidence,

particularly the post-substance-abuse treatment notes of Dr. LaRussa, supported the ALJ's decision.

In summary, the ALJ appropriately considered the medical evidence of record, including the opinions of Dr. Unnoppet and Dr. LaRussa.

### C. Dr. Goyne's and Dr. Eslami's Records

Bunn did not raise any arguments regarding Dr. Cheryl R. Goyne's or Dr. Nasrolla Eslami's treatment records in her original brief; rather, she asserted for the first time in her reply brief that the ALJ erred by failing to consider those doctors' records. Other judges in this court have repeatedly admonished that "'new arguments are improper if presented for the first time in a reply brief.'" *See, e.g., Trondheim Cap. Partners, LP v. Life Ins. Co. of Alabama*, – Supp. 3d –, No. 4:19-CV-1413-KOB, 2020 WL 7223375, at *4 (N.D. Ala. Dec. 8, 2020) (citing *Dates v. Frank Norton, LLC*, 190 F. Supp. 3d 1037, 1040 (N.D. Ala. 2016) (in turn citing *Herring v. Sec'y, Dept. of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005))). However, even if the court considers Bunn's improperly raised argument, Dr. Goyne's and Dr. Eslami's notes do not deprive the ALJ's decision of substantial evidentiary support.

Bunn began seeing Dr. Goyne, a pain management specialist, in January 2017. Between January 2017 and May 2017, Bunn consistently reported lower back pain and right leg numbness. On January 9, 2017, the clinical examination revealed cervical

27

muscle spasms, normal lumbar extension and flexion, pain on lumbar extension, increased lumbar lordosis, negative straight-leg raising test, normal range of motion in extremities, no extremity edema, weakness in extremities, antalgic gait, and decreased sensation in the right lower extremity.   (Tr. 411-15).   On January 31, 2017, the clinical examination revealed cervical spinal tenderness and muscle spasm, normal lumbar extension and flexion, increased lumbar lordosis, pain on lumbar extension, negative straight-leg raising test, normal range of motion in extremities, no extremity edema, normal tone, no tremors, and antalgic gait.   (Tr. 410).   On March 7, 2017, the clinical examination revealed limited ambulation, antalgic gait, tenderness over the cervical spine, normal lumbar extension and flexion, slouching posture, lumbar pain elicited by motion, increased lumbar lordosis, lumbar tenderness, sacroiliac tenderness, positive straight-leg raising test, muscle weakness, and abnormal sensation in the right lower extremity.   (Tr. 402).   On May 4, 2017, the clinical examination revealed limited ambulation, antalgic gait, cervical spine tenderness, normal lumbar extension and flexion, slouched posture, lumbar pain upon motion, increased lumbar lordosis, lumbar spine tenderness, positive straight-leg raising test, muscle weakness, and decreased sensation in the right lower extremity.   (Tr. 396).

Bunn received treatment from Dr. Eslami, a neurologist, between September 2015 and October 2016.   She reported lower back pain that radiated into her right

28

lower extremity, and Dr. Eslami consistently assessed lower back pain and lumbar radiculopathy.   On September 25, 2015, Bunn demonstrated normal gait, strength, and coordination.   Her waist movement was tight and restrictive, and she produced a "questionable" straight-leg raising test on the right.   The toe raise was slightly weak on the right, and she displayed muscle spasms and trigger points in the right lumbar paraspinal muscles.   A nerve conduction study showed mild positive sharp waves in the L5 and S1 paraspinal muscles, which Dr. Eslami interpreted as compatible with the clinical examination and the existence of L5-S1 radiculopathy.   (Tr. 357-58).

On October 6, 2015, Bunn again demonstrated normal gait, strength, and coordination.   Lumbar MRI results did not show any surgical lesion that might cause her back pain.   (Tr. 346, 356).   On October 19, 2015, Bunn demonstrated normal gait, strength, and coordination, but she produced a positive straight-leg raising test on the right.   (Tr. 355).   On November 16, 2015, Bunn produced a positive straight-leg raising test on the right, and she demonstrated tenderness to palpation of the lumbar paraspinal muscles.   She limped on the right side due to back pain, but Dr. Eslami could find no reflex asymmetry or focal neurological deficit to explain the level of pain she reported.   (Tr. 354).   On December 18, 2015, Bunn reported improvement in her symptoms after receiving an epidural block, and her clinical examination was normal. (Tr. 353).

29

However, by February 11, 2016, her pain had returned, and the clinical examination revealed slow gait, right-sided limp, and limited back range of motion. (Tr. 352).   On March 29, 2016, Bunn reported constant pain and numbness, but she could tolerate the pain and continue working with pain medication.   Upon examination, she demonstrated slow gait, right-sided limp, and limited back range of motion.   (Tr. 351).   On May 19, 2016, the clinical examination showed slow gait and a slight limp on both sides.   (Tr. 350).   On July 12, 2016, Bunn reported feeling "pretty good" with improvement in her pain.   She continued to display slow gait and a limp on both sides.   (Tr. 349).

On September 8, 2016, Bunn reported she had fallen twice at work because her right leg failed her.   As a result, her pain had increased.   She demonstrated slow, unsteady gait, limited lumbar flexion, a limp, and a positive straight-leg raising test on the right.   (Tr. 348).   On October 20, 2016, Bunn reported falling twice in the shower since her last visit due to her right leg failing her.   She demonstrated slow, unsteady gait, right limp, and limited lumbar range of motion.   (Tr. 347).

Bunn correctly points out that the ALJ did not discuss any records from Dr. Goyne or Dr. Eslami, and she did not even mention those doctors' names.   While that omission is concerning, the court finds it does not deprive the ALJ's decision of substantial evidentiary support.

30

Bunn last saw Dr. Eslami in October 2016, and her records from Dr. Unnoppet reflect that her condition improved after that date. Moreover, even though the ALJ did not directly discuss Dr. Eslami's records, she did address neurological findings similar to those Dr. Eslami assessed:"Although the medical evidence has shown that the claimant has had a positive straight leg test at times, she has been noted to have a negative straight leg raise at other times, and she has also been noted to have a normal gait and stance . . . ." (Tr. 22). The ALJ also remarked that "[a]n EMG and nerve conduction study was consistent with only 'mild[]' right L5-S1 radiculopathy with no evidence of neuropathy . . . ." (Tr. 20). That observation comports with Dr. Eslami's interpretation of a nerve conduction study showing mild positive sharp waves in the L5 and S1 paraspinal muscles, consistent with L5-S1 radiculopathy. (Tr. 357-58).

Dr. Goyne's more recent records bear more relevance to the state of Bunn's limitations at the time of the ALJ's decision. Even so, Dr. Goyne's records cover only a four-month period and do not reflect the status of Bunn's functional abilities on a sustained basis. Dr. Goyne's records reflected limited ambulation and positive straight-leg raising tests on only two occasions over a two-month period. Moreover, even though Dr. Goyne consistently identified antalgic gait, increased lumbar lordosis, spinal tenderness, and decreased sensation, he also consistently identified normal lumbar extension and flexion and normal range of motion in the extremities.

31

Based on the foregoing review, the ALJ properly relied upon the other medical evidence in the record, and there exists no reasonable expectation that a more thorough discussion of Dr. Goyne's and Dr. Eslami's records would have changed the administrative result.  Even without substantial discussion of Dr. Goyne's and Dr. Eslami's records, substantial evidence supports the ALJ's decision, and the ALJ properly considered the record medical evidence.

## IV.    The ALJ Appropriately Considered Bunn's Subjective Symptoms

Bunn next argues that the ALJ improperly discredited her subjective complaints of pain, mental and psychological limitations, and non-exertional limitations.  The court concludes the ALJ properly applied the Eleventh Circuit's standard for evaluating subjective limitations, and substantial evidence supported her decision.

> "To establish disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test by showing: '(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.'"

*Zuba-Ingram v. Comm'r of Soc. Sec.*, 600 F. App'x 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (*per curiam*)).  A claimant's testimony coupled with evidence that meets this standard "is itself sufficient to support a finding of disability." *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citations omitted).

32

Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, eliminated the use of the term "credibility" as it relates to assessing the claimant's complaints of pain and clarified that the ALJ "will consider any personal observations of the individual in terms of how consistent those observations are with the individual's statements about his or her symptoms as well as with all of the evidence in the file." SSR 16-3p, 2016 WL 1119029, *7 (Mar. 16, 2016).   An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location, duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* 20 C.F.R. §§ 404.1529(c)(3), (4).

SSR 16-3p further explains that the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent review can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, at *9; *see also Wilson*, 284 F.3d at 1225 (if an ALJ discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

Bunn testified during the administrative hearing that she experiences constant back pain at a level seven or eight out of ten and related numbness in her right leg.   She

33

reported depression that manifested as darkness, lack of hope, and daily suicidal thoughts.   However, she acknowledged her depressive symptoms had improved since she stopped abusing pain medication.   She also reported anxiety that manifested in panic attacks once or twice each week.   She occasionally experiences numbness in her arm, but that condition has improved since she underwent cervical spine surgery.   She can lift five pounds, walk one mile, stand for 15 to 20 minutes, and sit for 30 to 45 minutes.   She usually takes care of her own personal needs, but approximately once a month, her back pain increases so much that her husband must help her dress.   She cooks, shops with assistance from her husband, washes dishes and clothes, and cleans the kitchen and bathroom with assistance from her husband.   She does not make her bed or clean her floors.   On a normal day, she sees her son off to school, cleans the kitchen, and does laundry, but most of the day she sits at home watching television. (Tr. 43-50).

On an August 2, 2017, Function Report, Bunn stated her back pain limited the activities she can perform.   She takes care of her son by washing his clothes, cooking food, and taking him where he needs to go.   Her husband helps her with those tasks if her back pain becomes too bad for her to complete the tasks herself.   She takes sleep medication at night because her back pain otherwise would interfere with sleep.   She reported no problem with personal care.   She can cook regular meals, but she must sit

34

down to do so.   She does laundry for approximately ten to 15 minutes at a time.   She drives once or twice a day and shops weekly for groceries and clothing for her son.   A typical shopping trip lasts approximately 1.5 hours, but she needs to sit down and rest every 15 to 20 minutes.   She can manage money, and she spends most of her time reading and watching television in bed.   She does not engage in any social activities.

Her condition limits her abilities to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs.   She can walk one block before she needs to rest for ten to 15 minutes. She can pay attention for "a while"; she finishes tasks she starts; she follows instructions "very well"; and she gets along well with authority figures.   She does not handle stress well because of her anxiety and panic attacks, but she can handle changes in her routine. She fears losing her family, "going off the deep end," and taking more medication than she needs.

She also provided the following narrative statement:

> There are days that my back hurts so bad, I can hardly move.   And then some days my pain is tolerable that I can get up and do things but I have to take breaks.   I can't work or do anything that I used to love.   I feel as though I'm limited to my bed.   When I do get up, I can barely make it.   I've overdosed on medicine to end the pain and that failed.   I spent 5 days in a psych ward because of my suicide attempt.   I feel as though my life is spiraling out of control.   Our finances are a mess because I can't work.   I feel as though I'm going crazy.

(Tr. 197-204).

35

The ALJ accurately summarized Bunn's reports of subjective symptoms and resulting limitations.  (Tr. 24-25).  She appropriately applied the Eleventh Circuit's pain standard, finding Bunn suffered medically determinable impairments that could reasonably cause her alleged symptoms; yet, she determined Bunn's statements regarding the intensity, persistence, and limiting effects of those impairments did not comport with the medical and other evidence.  (Tr. 24).

The ALJ also articulated sufficient reasons to support her finding.  She reasoned that Bunn's cervical fusion surgery "dramatically improved [her] physical functioning, with the most recent examination showing full range of motion and no neurological deficits," and that Bunn's "treatment for substance abuse dramatically improved her psychological functioning, with the two most recent mental status examinations showing no abnormalities."  (Tr. 25).  The record supports that conclusion.

Bunn underwent cervical fusion surgery on June 14, 2017.  (Tr. 444-46).  On July 27, 2017, during her first visit to Dr. Unnoppet after the surgery, she reported only back pain, not neck pain, and the examination of her neck was normal.  (Tr. 307-08).  During the September 9, 2017, consultative examination, Bunn displayed full range of motion in her cervical spine, and she did not complain of any symptoms related to her neck. (Tr. 455-60).

As previously discussed, Bunn underwent outpatient substance abuse treatment at Bradford Health Services between August 15, 2017, and October 5, 2017.   (Tr. 464-73).   Her discharge report noted improvement of her symptoms, and she reported feeling great during follow-up visits to her psychiatrist in October and November 2017. Clinical examinations during those follow-up visits also reflected normal findings and improvement of her mental health condition.   (Tr. 472, 475, 478-81).

While the ALJ did not discuss Bunn's back pain in the section of the administrative opinion immediately following her explication of the pain standard, earlier in the opinion, she noted that objective testing of Bunn's lumbar spine and pelvis produced normal results, as did a nerve conduction study.   (Tr. 20, 280, 346, 371, 379). She also pointed to Dr. Unnoppet's July 27, 2017 examination, which produced normal findings other than obesity.   (Tr. 20, 25, 307).   Finally, she relied upon Dr. Blanco's consultative examination, which produced normal results except for obesity and spinal tenderness (Tr. 20, 26, 455-60), and Dr. Bailey's September 2017 state agency opinion, which noted Bunn's longitudinal treatment for back pain but nonetheless assessed an ability to perform light work.   (Tr. 26, 73-74).   The record supports the ALJ's observations about objective testing, and, as discussed, the ALJ properly considered the treating, consultative, and administrative medical opinions.   Therefore, substantial

37

evidence supports the ALJ's decision not to credit Bunn's complaints of disabling back pain.

Bunn argues the ALJ inappropriately considered the extent of her daily activities in determining whether to credit her subjective complaints, as her limited activities do not indicate the ability to perform work on a consistent basis.   The court disagrees. While Bunn's daily activities would not in and of themselves equate to the ability to perform full-time work, the ALJ did not consider these activities in a vacuum.   Instead, when combined with the other evidence of record, the ALJ concluded the activities undermined Bunn's subjective complaints.   That determination found support both in applicable law and in the record evidence.   *See Majkut v. Comm'r of Soc. Sec.*, 394 F. App'x 660, 663 (11th Cir. 2010) ("Although a claimant's admission that she participates in daily activities for short durations does not necessarily disqualify the claimant from disability . . ., that does not mean it is improper for the ALJ to consider a claimant's daily activities at all.") (citations omitted); 20 C.F.R. § 404.1529(c)(3)(i) (stating that an ALJ should consider a claimant's daily activities in evaluating the limiting effects of her impairments).

Based on the foregoing, the court concludes the ALJ appropriately considered Bunn's complaints of subjective symptoms.

**V.    The ALJ Appropriately Determined Bunn Possessed the Residual Functional Capacity To Perform A Limited Range Of Light Work**

As previously discussed, at step four of the sequential analysis the ALJ formulates a claimant's RFC by assessing his or her "ability to meet the physical, mental, sensory, and other requirements of work."  20 C.F.R. § 404.1545(a)(4).  The claimant's RFC represents "the most [he or she] can still do despite [their] limitations."  20 C.F.R. § 404.1545(a)(1).  Assessing a claimant's RFC lies within the exclusive province of the ALJ.  *See* 20 C.F.R. § 404.1527(d)(2) ("[T]he final responsibility for deciding [a claimant's RFC] is reserved to the Commissioner."); 20 C.F.R. § 404.1546(c) ("[T]he administrative law judge . . . is responsible for assessing [a claimant's] residual functional capacity."); *Oates v. Berryhill*, No. 17-0130-MU, 2018 WL 1579475, at *8 (S.D. Ala. Mar. 30, 2018) ("The responsibility for making the residual functional capacity determination rests with the ALJ."); *Del Rio v. Berryhill*, No. 3:16-CV-00489-RFC, 2017 WL 2656273, at *8 (W.D. Tex. June 20, 2017) ("The ALJ has the sole responsibility of determining Plaintiff's RFC . . . .").

Here, the ALJ determined Bunn retained the RFC to perform a limited range of light work.

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting

39

> most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 C.F.R. § 404.1567(b).

Bunn argues that the ALJ should have found her incapable of performing light work due to medical evidence, including Dr. Unnoppet's evaluation, indicating she experiences additional limitations on her abilities to sit and stand. However, as discussed, the ALJ properly considered Dr. Unnoppet's opinion, properly assessed the other medical evidence, and properly evaluated Bunn's complaints of subjective symptoms.

Bunn also argues the ALJ failed to include all of her functional limitations in the hypothetical question she posed to the vocational expert during the administrative hearing. "In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Forrester v. Comm'r of Soc. Sec.*, 455 F. App'x 899, 903 (11th Cir. 2012) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002)). However, "the ALJ is not required to include findings in the hypothetical that the ALJ has found to be

unsupported." *Id.* (quoting *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1161 (11ᵗʰ Cir. 2004)).

The ALJ's hypothetical question to the vocational expert mirrored her residual functional capacity finding.  (*See* Tr. 23, 51).  Bunn complains that the hypothetical question lacked limitations resulting from her back condition, including those Dr. Unnoppet imposed in his evaluation.  However, as determined, the ALJ properly rejected Dr. Unnoppet's opinion and properly considered the functionally limiting effects of Bunn's back condition.   Thus, the ALJ did not need to include any additional limitations in her hypothetical question.   *See Crawford,* 363 F.3d at 1161.   As discussed previously, the ALJ properly considered all of the medical evidence and properly considered Bunn's complaints of subjective symptoms in determining the extent of her functional limitations.   Accordingly, the court concludes the ALJ included all of Bunn's impairments in the hypothetical question to the vocational expert, and she properly relied on the vocational expert's testimony.

Bunn also argues the ALJ committed a legal error by applying an inappropriate legal standard for the definition of light work.   According to Bunn, the ALJ's imposition of additional non-exertional limitations – like no climbing, pushing, pulling, kneeling, crouching, crawling, or exposure to vibration or hazards – indicates she

actually cannot meet all the demands of light work and can only perform sedentary

work instead.[4]

That argument lacks merit.  When a claimant's occupational base falls between

two exertional levels, as when a claimant can satisfy most but not all of the exertional

demands at a particular level, or when a claimant can satisfy all the exertional demands

of a particular level, but experiences additional non-exertional limitations, the ALJ

cannot apply the grids to discern the claimant's disability status, but must instead

consult a vocational expert to determine whether a significant number of jobs exist in

the national economy for a person with the claimant's RFC.  *See Smith v. Astrue*, No.

3:10CV641-WC, 2011 WL 2650588, at *5 (M.D. Ala. July 6, 2011) (citing *Anderson v.

Comm'r of Soc. Sec.,* 406 F. App'x 32, 35 (6th Cir. 2010); *Watson v. Astrue,* 376 F. App'x

953, 956-57 (11th Cir. 2010)); *see also* SSR 83-12, at *3 ("In situations where the rules

would direct different conclusions, and the individual's exertional limitations are

somewhere 'in the middle' in terms of the regulatory criteria for exertional ranges of

---

[4] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567.

work, more difficult judgments are involved as to the sufficiency of the remaining occupational base to support a conclusion as to disability.   Accordingly, [vocational specialist] assistance is advisable for these types of cases.").   The ALJ satisfied that requirement in this case by asking a vocational expert whether a person with Bunn's RFC could perform work existing in sufficient numbers in the national economy. Therefore, the ALJ did not commit legal error in assessing an RFC for light work.   *See Smith,* 2011 WL 2650588, at *5 ("[B]ecause the ALJ properly applied governing regulations to determine the extent of the erosion of Plaintiff's occupational base of light work, Plaintiff's claim that, notwithstanding the medical evidence and the vocational expert's testimony, a finding of sedentary work would be a 'better fit' is unavailing.").

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision. The court will enter a separate final judgment.

**DONE** this 29th day of March, 2021.

_____
HERMAN N. JOHNSON, JR.
UNITED STATES MAGISTRATE JUDGE